We'll hear argument first this morning in Case 13-369, Nautilus v. Biosig Instruments. Mr. Vandenberg. Mr. Chief Justice, and may it please the Court, the Patent Act requires particular and distinct claims, but the claim in this case is not particular and distinct. It is ambiguous because it has two reasonable readings with very different claim scopes, even after all of the interpretive tools are applied. Such ambiguous claims defeat the public notice function, which is at the heart of Section 112, and they increase litigation, they cause more claim construction disputes, and they cause more reversals of district court claim construction rulings. Taken all together, ambiguous claims in the Federal Circuit's test allowing implications of ambiguous claims defeats the very purpose of Section 112 and the patent system, namely, to encourage and promote innovation by others after the first patent. Ginsburg. Why is this claim ambiguous? It's evident that these electrodes have to be close enough so that the user's both electrodes, but separate enough to keep the electrodes distinct. Why isn't that sufficiently definite? Your Honor, if that were the only reasonable construction, then that may suffice. However, here, the other reasonable construction is that the spaced relationship is a special spacing that causes the electrodes to achieve the desired result. And that was the construction that the majority found at the Federal Circuit, namely, that spaced relationship is not what it sounds like, namely, any spacing, but rather is a special spacing that is derived by trial and error testing to get the spacing just right so that the electrodes detect. Sotomayor, I don't think the majority or the concurrence or the other side disagreed with that. The only question was whether it was part of the specifications or not. I thought that was the only difference between them. They both agreed, ultimately, that the electrodes had a cancel-out. Was it the EMGs? Correct. So they both agreed that that was part of the scope. The only issue was, was it part of the specifications or part of the claims? No? But both of them make up the scope of the patent. Your Honor, we would submit that the disagreement between the judges and, in fact, between Biosec itself went to the scope of the claim. Namely, does the scope of the claim cover all ways of achieving the desired result, no matter how the electrodes are spaced? That's one possible reading. The other possible reading is that the claims cover only a special spacing of the electrodes to achieve the desired result. And why that matters is if you think of the inventor in 1994 who invents a new material for electrodes, and this new material achieves the desired result of detecting equal muscle signals on the left and right side, regardless of the spacing of the electrodes. So it doesn't matter where you put the electrodes, as long as you can touch them. This new material achieved the desired goal. That inventor would not know in 1994 if they infringed or not, because if the claims had the interpretation that the majority eventually gave them, namely that the spaced relationship has this functional limitation and it must be the result of this trial and error balancing, there would be no infringement. But if spaced relationship meant any spacing, then there would be infringement. So that is the exact type of zone of uncertainty that United Carbon warned against and which deters the innovation. But it can't mean any spacing, because anyone skilled in the art would know the hand has to cover it. So you're basically talking about a fairly narrow range between one side of the hand and the other and not too close together that they don't work. And that seems to me that someone skilled in the art can just try a couple of things and see where the trial and error. Trial and error could mean a very difficult thing, like Edison discovering what works in a light bulb. But here you've got a very limited range, and someone skilled in the art will just say, well, let's try it close to the middle, let's try it so far apart. But it's not any spaced relationship. And that's correct, Your Honor. And I do, when I refer to any spacing, it's really a shorthand for any spacing that is narrow enough so that the hand can actually touch both electrodes, but not touching. So I agree that under each interpretation, it makes sense that the electrodes have to be touchable by a single hand, and they can't be touching each other, or there would simply be a single electrode. Sotomayor, what would be the purpose of the invention if it were only covering spacing without the function of canceling the EMG? I can't understand, if I read this patent, what it would do unless you add its function. Well, Your Honor, the purpose of the patent is it would cover possibly, again, all techniques for achieving the desired function. So, again, going back to the invention of the new material, if the inventor comes up with a specific way of achieving the result, and here they came up with trial and error spacing, they didn't describe that in the patent. That didn't be ‑‑ that wasn't described by the inventor until 15 years later. But nevertheless, let's say they had this specific way of achieving it. They very well could have drafted the claim intentionally the way they did to have a broader coverage so that they cover all possible ways of achieving that desired result. Patent attorneys are trained to try to draft the claims, you know, some claims as broadly as possible. So that reading by the concurrence was a very plausible reading of this claim. I'm reading the claim. It has any spaced relationship as long as Chief Justice indicated. I can touch them, and they're not touching each other. But that's it. There's no other restriction on what spaced relationship means. That's a very reasonable interpretation, and that was the interpretation that Biosig asserted at the Markman claim construction in this case. Scalia, you acknowledge that it would be a valid patent if all you said is you have to space these things, and you figure out what the spacing is going to be. You can get a patent for tell somebody trial and error. Let's take Edison's light bulb. I mean, could he say, you know, get some material that will illumine when electricity is passed through it, and you figure out by trial and error what this material might be. It might be tungsten, who knows, you know, maybe it's chewing gum. Would that be a valid patent? It would not, Your Honor. That's not. I don't really understand this trial and error spacing stuff. What is the limit on trial and error? Can you get patented anything when you say, you know, this is the basic principle? You figure out what, you know, what makes it work. Well, Your Honor, there's two levels of indefiniteness here. First, it's unclear which construction was intended. So basically, there are two reasonable. Scalia, I understand that, but I'm asking why the second construction is a plausible patentable invention. Your Honor, it's not patentable. In fact, it would be indefinite. However, the person of skill in the art reading the claim is not expected to do a full-blown invalidity analysis. They're simply trying to figure out where can I innovate. I see this patent, it issues in 94, the alternative. All the person skilled in the art will know is that he has to figure out what the spacing is, right? No, Your Honor. But still, the inventor doesn't tell you what the spacing has to be. Well, that is the second problem, and we agree. The second problem with these claims is they're purely functional. They simply have a clause that says whereby good things happen, namely that equal muscle signals are detected. The claims don't tell you how. They leave that up in the air. Maybe it has something to do with the spacing of electrodes, but maybe not. And the further problem is that the specification here did not describe any technique for achieving the desired result. If one reads the specification, you read it and it says various things, and it says whereby the muscle signals are detected as being equal on both hands, on both electrodes. Well, in reality, the electrical signals on my left and right palms are unequal. Somehow, however, the electrodes detect them as if they're being equal. The patent doesn't say how, doesn't say why, it doesn't say what caused it. So this is the purely functional type of claim that United Carbon and General Electric. Roberts. Do you have any disagreement with the standard that's articulated by the Solicitor General? He says that, you know, a patent satisfies the requirement if, in light of the specification and the prosecution history, a person skilled in the art would reasonably understand the scope of the claim. You know, we may or may not, depending on how the Solicitor General would apply that standard to a claim that has two reasonable interpretations after the person of skill in the art reads the claim in light of the specification and applies all the interpretive tools. Ginsburg. The court has to come up with a formula. You are saying the Federal Circuit's formula is no good. The Solicitor General has, as the Chief Justice just said, has suggested an appropriate formula. And you say, well, it depends on the application. As a formula, do you agree? Your Honor, we think it would certainly be an improvement over the Federal Circuit's amenable to construction and insolubly ambiguous test. The Solicitor General refers to reasonably understand. The parties have agreed on the phrasing of reasonable certainty. We think reasonable certainty comes out of this Court's cases, and therefore we prefer that. To the extent, obviously, reasonable understand means the same as reasonable certainty, then we accept that. Roberts. Well, that's what I'm having trouble dealing with. I would suspect your friends on the other side would say yes, right? They accept that, too. And you say, but it can't be insolubly ambiguous or not amenable to construction. And they say, well, that's not really what the Federal Circuit said. So until we get to the application, I don't see much disagreement among any of you about the standard or what's wrong with the Federal Circuit's articulation. And as the questions kind of suggest, we move very quickly into the particular invention and the application. And I'm just not — I'm curious what you want us to do if it seems like in every case we have to get right into the application rather than the legal standards. Well, I think the key dispute here is what happens if after all the interpretive tools are applied, there's a genuine ambiguity, meaning there really are two reasonable interpretations of the claim. Genuine ambiguity, person of skill in the art applying all the interpretive tools, trying to understand the claiming. What happens then? Our position is that if such a claim, which essentially points in two different directions, is indefinite, the problem with the Federal Circuit's test is the Federal Circuit would not find that indefinite. Instead, the Federal Circuit would pick one because it's amenable to construction. They would pick one. They would then ask, is the construction they picked itself sufficiently clear for a person of skill in the art? Alito, what if a person who's a reasonable — a skilled artisan says that the claim could mean A and it could mean B, they're both reasonable constructions, but this person is reasonably certain it means A but not B, what would happen then? Well, I think the proper analysis would be to look at the alternative construction and ask, was that a reasonable interpretation? Was the second interpretation a reasonable interpretation of the claim? And courts every day make judgments like that, whether interpretations, for instance, of statutes, a second interpretation of a statute is reasonable. Well, the only analog that comes to my mind immediately is our review of agency action. Is that the standard that you want us to use? If, you know, it's within the scope of the ambiguity, oh, we don't think that's the right answer, but it's close enough for government work. Is that what you want us to apply to patents? No, Your Honor, because the starting point here is the text of the statute. The text of the statute could hardly be more emphatic. Section 112 requires that the invention be described in full, clear, concise, and exact terms, and then be claimed particularly and distinctly. Given that text of the statute, given the statutory purpose of protecting the next innovator from uncertainty, we think that that statutory language needs to be enforced forcefully. Can it be reasonable but wrong? No, Your Honor. If a claim Is whatever interpretation is wrong, is ipso facto unreasonable? If I understand correctly, a claim has only one proper construction. If a claim is subject to Okay. So whatever is wrong is, by your definition, you know, we construe statutes all the time, and we certainly don't think that the result we come to is the only reasonable result. We think it's the best result, but not the only reasonable one. But you're saying in this field there's a right result and everything else is unreasonable. We would analogize it most closely to the Chevron ambiguity analysis. Yes, that's what I proposed first, but I thought you didn't like that. Well, if I misunderstood the question, I apologize. But my understanding is in order to determine whether or not there is ambiguity in the statute, the Court first looks at the statutory language and then applies interpretive tools. The same is true here. And then the Court, if the Court finds there are more than one reasonable readings, then the Court will designate the statute as ambiguous and then move on for the remainder of the Chevron analysis. Under this statute, however, if the Court determines the claim is ambiguous, the proper result is invalidity. And what is the ambiguity? Is it, I thought from your brief, that it was the term space relationship. Is that the ---- what is the ambiguity? Yes, Your Honor. It is the term space relationship in the context of the claim. And again, the ambiguity is that this claim either covers all possible spacing of the electrodes within the boundaries that we've discussed, or it only covers special spacings of the electrodes that are a result of trial and error in order to achieve the desired result. Those are hugely different claim scopes, and that uncertainty between those two is what would chill the patient. Sotomayor, did you proffer any evidence below showing that a person with ordinary skill in the art did not understand what this claim meant? Your brief seems to rely only on the dispute between the majority and the concurrence. But was there ---- did you proffer any evidence below? Your Honor, we did not proffer our own experts. The evidence below included that Biosig's own expert asserted that each of the competing constructions was reasonable, in essence. More specifically, he said that, this was Dr. Yannoulas, said at Joint Appendix 274, that the person of skill in the art could readily discern the trial court's construction of spaced relationship. The trial court's construction was any spacing. Then the expert went on and said the person of skill in the art could easily discern the claim scope because the EMG signals have to be substantially removed. That was the competing functional construction of spaced relationships. So their own expert supported both of these competing constructions. And the reason they were comfortable doing that is because ---- Sotomayor, I have a really big problem, which is we as justices disagree on the meaning of things all the time. And one side will say, this is perfectly clear from the text of the statute, from its history, from its context, and we do all the statutory tools. And there will be one or more of us who will come out and say, no, we think it's a different interpretation. Would we have any valid patents in the world if that's the standard that we adopt? That any judge on a panel thinks that there's another interpretation, that that's sufficient to invalidate a patent as indefinite? Your Honor, we are not taking the position that because the judges below disagreed on the construction that that is dispositive or proves ambiguity in the claim. We did say the fact that BIOCIG itself took both competing constructions as the need arose. Sotomayor, I don't know about the majority, but the majority here said that it was clear from the prosecution history, the specifications, and the description, that this was definite. I don't know on what basis I would have to overturn their review of that issue. Well, that BIOCIG has taken both claim constructions, we've not seen them assert that either claim construction was unreasonable, the majority did not find the concurrence's construction unreasonable, nor did it find the trial court's construction unreasonable, their experts took both positions. So we have a claim that on its face, I mean, the starting point is looking at the patent, of course, not what judges or experts or parties said later. The patent on its face is grammatically ambiguous. There is a whereby clause dangling in the middle of the claim that says whereby something good happens. Scalia, we understand all that. I'm still having trouble understanding what your standard is. You agree that your standard is not there is a right answer, and everything that is not the right answer is unreasonable. That's not your position. That's right, Your Honor. Right? Right. Okay. Then you invoke Chevron. Do you mean that anything that would pass Chevron Step 1 is okay? Your Honor. That is, if it would pass Chevron Step 1, it's ambiguous. Well, if I can be clear about pass. If it's ambiguous under Chevron Step 1, then that is a close parallel to being ambiguous under Section 112, paragraph 2. But again, our starting point, of course, is not Chevron. It's the statutory text, which the standard we submit is to assert or to enforce the statutory text by its plain terms. Would this help? Do you agree that the standard at the PTO, and let's say that it's whether or not the claim is definite, if a person skilled in the art would be reasonably certain of its scope, is the standard used by the PTO the same standard that the CA Fed ought to use? Yes, it is, Your Honor. All right. How does that that's a sensible answer, I think. Now, how does the presumption of validity bear on the application of that same standard in the court of appeals? The presumption of validity certainly applies to this defense. It requires the challenger to raise the defense, to preserve the defense, you know, plead it as affirmative defense, to make the initial argument as to why the claim is definite. Doesn't it imply some deference on findings of fact? Your Honor, it would be rare for there to be in an indefiniteness case to be any underlying finding of fact. The issue of indefiniteness is really subsidiary. What does it imply? What sort of deference does it accord to the PTO? If, indeed the presumption of validity, does that accord some deference to the PTO? And how would that apply or not apply here? It would apply. It does not apply in this case. There are no fact findings out of the Patent Office regarding indefiniteness. But if there was the same indefiniteness you came up, and the Patent Office found, for instance, that a term of art, let's say nanotechnology, biotechnology, term of art had a particular meaning, then that fact finding may be entitled to deference by the trial court. However, indefiniteness itself is a legal determination. The Federal Circuit said that. They review this. They know how. So there's no deference to the PTO as to that legal interpretation? No, Your Honor. There are no more than there would be deference to the Patent Office claim construction or any other legal decision. Kagan. Kagan. The quotation that the Chief Justice read to you from the Solicitor General's brief referred to the use of prosecution history. Do you agree with the Solicitor General about that use, about the permissibility of that use? Yes, Your Honor, so long as the prosecution history that's being used to clarify existed at the date the patent issued. If the person of skill in the art, again, is supposed to be motivated to innovate around the patent the day it issues, here there was a reexamination prosecution history. Sometimes there's later prosecution history in a related patent. That type of prosecution history shouldn't be used to sort of ex post facto cure an initial indefiniteness. But putting aside that rare instance, yes, the prosecution history and the specification are part of the interpretive tools that are available and would be used. I think it's important to remember here, there is no legitimate need or excuse for ambiguity in patent claims. Once the applicant has satisfied paragraph 1 and its strict requirements for describing the invention, it is easy to claim the invention particularly and distinctly. The only reason that there are so many ambiguous claims out there today is that patent attorneys are trained to deliberately include ambiguous claims. Ambiguous claims make the patent monopoly more valuable. Every patent attorney knows that. Ginsburg. The government tells us there are some 22,000 patent grants since 1976 that use the term spaced relationship. I suppose many of those would fail to attest. Not likely, Your Honor. It would be highly unlikely in, you know, more than 99 percent of those cases that there would be any uncertainty of what spaced relationship meant. The problem here is not those words. It's the grammatical ambiguity in the claim. It's the fact that the specification did not describe, even arguably, the invention. That wasn't described, the trial and error spacing, until 15 years later. And that the patent specification has no concrete examples of embodiments inside the claim or outside the claim. So we ask that the Court, you know, reaffirm its precedents in United Carbon, General Electric, and Eibel Process. Eibel Process upheld a claim that had vague-sounding language. The language was high elevation, substantial elevation. But it was upheld because that patent specification concretely described the invention, its theory of operation, concrete examples that came inside the claim scope, concrete examples that fell outside. And that's why that patent satisfied the particular distinct claiming requirement and this one does not. I'll reserve the balance of my time. Roberts. Thank you, counsel. Mr. Harris. Mr. Chief Justice, and may it please the Court. The decision of the Federal Circuit should be affirmed for two reasons. First, that Court correctly held that the test for definiteness is whether a claim puts a skilled artisan on reasonable notice of the boundaries of the invention. And secondly, whatever the case is, the Court should not be able to say, if that's what it held, we wouldn't have taken this case. I thought we took it because it had some really extravagant language. The Court below used the word I mean, it's one thing to run away from that language. As your brief does, it's another thing to deny that it exists. Justice Scalia, we're not denying that those words exist insolubly ambiguous. But what I think this Court below, the Federal Circuit, in this case explained, and it's explained consistently, is that that those two words are not the test all by themselves. In this very case, the Court would not be able to say, if that's what it held, we wouldn't have taken it. Kennedy, you would agree, I take it, that if it was indissolubly ambiguous, were the standard that the Court used, that we should reverse? If there were no other context, and only those words alone would be used, it seems that some district courts might misinterpret those words, as the Slicer General has mentioned. But in this case, it was clear, as I suggested earlier, nobody agrees with that formulation, right? Yes, I guess so, Your Honor. But I want to make — I just want to clarify what that point is. What the Federal Circuit said below, the full statement of its test that it was applying in this case was, if reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to informed, skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness. There's no suggestion that the Court — Sotomayor, No, there is, if you read that language carefully. It seems to be saying that what has to be reasonably definite is the court's construction, and takes the emphasis away from whether a skilled, someone skilled in the art would be definite. There is a big difference between can I read this and give it a construction and whether or not a construction is definite enough so someone skilled in the art could understand it. Well, we would completely agree that the test needs to include what the skilled artisan would have understood at the time. That's my problem with the Federal Circuit's articulation, and as you read its decisions, its focus is not always on that question. Its focus seems to be on the reasonableness of its construction. As opposed to the reasonableness of a skilled artisan's, or whether a skilled — someone skilled in the art could reasonably construe the scope of this patent. But I think it's quite clear from the way the Federal Circuit actually applied the standard in this case that the Federal Circuit was looking to what the evidence was as to what skilled artisans would do with this claim language. If anything, it's Nautilus that's arguing that it doesn't seem to matter what a skilled artisan thought at the time. Sotomayor So what do you see as the difference? He says the concurrence's definition is different from the majority's. The government — explain. I read your brief. I know what you think the difference is, but. Well, between the majority and the concurrence below. First, we don't think that's the case. Sotomayor He says there's a difference in scope, so address that. Yes. Why don't you see that as being a difference of importance? It would be a difference if there were a difference in scope, but there isn't one. I think it's very important to look at what the majority and the concurrence actually did. The majority was addressing definiteness. The majority did that in two steps. The majority said we're going to apply the principles of claim construction. The first thing it did was it looked to the claim language, the written specification, the diagrams, all the traditional tools of patent interpretation. It said there's definiteness here because there are bounds to this space relationship. It isn't just anything. It has to be greater than zero. It has to be less than the width of a hand. It's implicit and actually explicit in the statement of the patent. Then it said that the functional limitation, which is the whereby clause in the patent, sheds additional light. That's where the concurrence got off the train. And the concurrence said, I don't think we need to reach that issue. Nautilus has turned that approach on its head. Nautilus says that the fact that the concurrence didn't think it was necessary to reach the functional limitation, in fact, said that it's not before us for procedural reasons. Nautilus reads that as if the concurrence was somehow disavowing or disclaiming the majority's approach. It never said that. It was a procedural argument that it had. And, in fact, there's no disagreement between the majority and the concurrence. Scalia, would this patent be valid if the concurrence's approach prevailed? It wouldn't work, would it? It would not work. The mere fact that you spaced it somewhere where the hands can touch it would not necessarily produce the result, would it? If the patent said nothing other than there's a space between. That's all the claim said. Well, no, Justice Scalia. The whereby clause explicitly said, it described the structure. This case is quite different from General Electric, where there was no structure being given. It said that there are going to be EMG signals that are going to be detected by the electrodes. Right. Then those signals, which will be detected as equal, are going to be fed into a differential amplifier and thereby subtracted or canceled out. Whereby? Whereby. I would read that as saying, so long as you put the spacing at some point where the hands can touch it and they're not touching, that will produce the result that the signals will be equalized. That's how I would read the claim. Well, in fact, if the electrodes are configured in such a way that they detect the signals as equal, it would produce that. No, no. Yes, I understand that. But that's not what it says. It doesn't say space the electrodes in such a manner that the signals coming from each side will be equal and you'll have to do this by trial and error. That's not what it just says. It just says, you know, keep the electrodes apart. They have to be apart so that the hands don't touch, and on the other hand, they can't be outside the scope of what the hands grip. That's all it says. Whereby, if you do that, the signals will be equalized. That's how I would read it. It wouldn't work that way, would it? It wouldn't work if it gave no specifics. But this is where the fact that it all depends on what the skilled artisan would do is critical, because there was uncontested evidence that a skilled artisan in 1992 was able to read this patent and understand how to put together this invention in such a way that it worked. In fact, Dr. Galeana's research assistant did it in two hours, was able to build this invention based on the diagrams. Breyer, I'm a little confused here. Imagine there are two kinds of electrodes, a blue one and a green one, and you have a blue one and a green one on the left hand, and a blue one and a green one on the right hand. And now, you're going to not let them touch. The blue can't touch the green. I got that. And suppose on your left hand, you put the blue one here and the green one there. And on the right hand, you put the blue one here and the green one here. So they're not touching, but they're different distances from each other in the two hands. Does it work or not? If the distance is on the two sides of the two hands. Well, look, this is like that one hand. Yes. And this one's like the other hand, okay? So does it work or not? I don't know. Let the record show that the Justice is holding his fingers very tight. All right. Look, on the green one is 2 inches. The space between the green one and the right one is like a half inch for the left hand, and it's like 1 inch for the right hand, okay? Does it work? If I could answer that question, Justice Breyer, in a more roundabout way. What the It was asked in a pretty roundabout way. What the uncontested evidence showed was that a skilled artisan at the time knew how to space electro. And did he know that there had to be, like, if you put it 2 inches across here, so there are 2 inches between them, and over here it's like a half inch between them, did he know it did work or did he know it didn't work? He would know by He knew if it worked, but I want to know if it does work. It probably would not work in this situation. Okay. Now, as soon as you say that, that's his point. His point is that when I read it, I guess that's the point that's being made. When I read it, it just seems to me that the green one can't touch the blue one, and the whole thing has to fit within your hand so each of them catches a finger. And he's saying that isn't good enough, that doesn't work. They have to be the same distance. And what that distance is, this document doesn't tell us. And it doesn't even tell us they have to be the same distance. So therefore, since it doesn't tell us that, it's ambiguous. Is that the correct argument? All right. We think it's the correct argument. So, now, what's your answer? This Court has never found a problem with the need for some amount of experimentation in order to get the parameters to work. It doesn't even say that. It doesn't even say that. It doesn't say, go experiment whether somebody with great big fingers on one hand and tiny little fingers on the other hand. In IBO process, this Court faced, as Mr. Vandenberg mentioned, faced a case in which a method of manufacturing paper, all it said was that the angle of the supply of the pulp had to be high. It didn't say anything more than that. Didn't it? Is it part of an answer to Justice Breyer's question that the diagram shows them equally spaced, or is that not relevant? I don't think the equal spacing is the only issue, Mr. Chief Justice. The issue is how do you find what that spacing is. And the answer, the uncontested answer, is that skilled artisans were able to do that very quickly. It's not trial and error as if it's throwing darts and just seeing what might work. It's like tuning a radio. Just happen to move things around in order to get. Sotomayor, you know, I could understand that if the claim said that. If the claim said, you know, fiddle with it until it works. But it doesn't say that. It just says, you know, spacing. And I would think so long as they're spaced, they don't touch, and they're no more than the widths of the hands, it will work. It doesn't say that. I don't think the whereby is an invitation to experiment. But the other case you were talking about, tell us more about it. It just said a high angle. It said a high angle. Mineral separation maybe is even a stronger case. In mineral separation, it was a method for extracting ore from, metal, metallic ore from. Sotomayor, why are you running from? The working here is that it cancels out a signal, correct? Yes. And so what the majority said is that that function is part of the understanding of the spacing. Isn't that what the majority said? It said that an additional constraint on the spacing is the fact that it has to work in a certain way. So I don't know whether it has to be equal spacing or one could be one inch and the other half an inch apart. The bottom line is that to work, it has to cancel out. That's part of the scope. Yes. Yes. Now, the concurrence said, no, you don't have to, you can't, I'm not looking at the specification. Yes. I think it's definite without it. Yes. All right. I don't see how it could be. That's what I think Justice Scalia is saying and Justice Breyer is saying, that if we don't understand what the purpose is, how can that spacing be definite enough to make this thing work? So tell us why you think that the concurrence's interpretation is wrong. What's he missing? When it says whereby, whereby means the elements that came before are going to produce that result. There's never been a problem with the fact that some amount of experimentation — I hate to even call it that because it's really just tuning dials on a radio — may be needed in order to get the exact number, the exact setting. But what the whereby clause says, it conveys a structure. It says they have to be detected, the signals, in such a way that they're equal. That normally wouldn't be the case. In all the devices that existed up to that time, they wouldn't be equal. Signals would come in from the right and the left hand that during exercise would be unequal because when a person is running or moving, the right hand and the left hand have different amounts of contact with the electrodes. The whole novelty of this was the fact that you didn't have to cancel EMG signals, what we call downstream, meaning by just filtering them out. They could be detected in such a way that they would be equal and then be canceled. Kagan. Why didn't the patent provide more specificity as to the exact spacing? Because like eyeball process and like mineral separation, it wasn't possible. It depended on too many variables. It depended — the actual spacing in every single instance would depend on four variables. This was made clear in the expert declarations. The size of the electrode, the shape of the electrode, the spacing between the electrodes and the materials. Those four things. Just like an eyeball process, what the Court said was you may not know in advance what it is, but a skilled artisan will know. Ginsburg. What about the apparatus on which the electrodes are mounted? Isn't that another variable? Why you can't say half an inch, because it depends, as you said, on size, shape and materials of the electrodes, but doesn't it also depend on the apparatus? Yes. Yes, it does. It does. The critical point is that there's no question that a skilled artisan knew how to do this. They've introduced no evidence that a skilled artisan didn't know this. In fact, their entire argument is based on attorneys coming up with arguments later. What's the case that he postulated, an abstract one, where you have two perfectly reasonable constructions? What happens then? If there are two constructions, each of which has survived the Markman claim construction process, and each one of them does the things that Markman says the correct construction needs to do, which is that it fully comports with the instrument as a whole and it preserves the patent's internal coherence, then, yes, we would agree in that case it's indefinite. But what they've put forward doesn't mean that it's indefinite, but it's indefinite. Kagan. Kagan.            Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Well, I'm not sure I agree with the premise, Your Honor. The Markman explained that the nature of the test may need to be, or the nature of the process may need to be necessarily sophisticated. It's a hard thing to construe claims, and we — it depends critically on the abilities of the skilled artisan to do that. Just to return to that point again, because I think it's such an important point, all they're relying on here are attorney arguments. In fact, this morning, just now, Mr. Van Berg mentioned that the ambiguity isn't even in the words-space relationship. This is the first time I've ever heard that. It's actually somehow in the whereby clause. That argument was never made at any time below or up until now. And the reason that's critical, I'm not arguing waiver, but the reason that's critical is the rule that Nautilus is suggesting here will encourage attorneys years after infringement has occurred to just come up with some way to argue that there's something that's unclear in the patent. Roberts, can I just go back to my, you know, the two reasonable? Is there a range? The Chevron analogy again comes to mind. Let's say one is more reasonable than the other, but they're both reasonable. What type of range do you have before you say that the patent is invalid? I think I agree with the comments that were — the questions that were asked before, that it's very common in matters of statutory interpretation to have different answers, some of which are reasonable but are incorrect. We hold — we believe that the test requires that the — if there's — there has to be more than one correct construction before it's going to be indefinite. If it only depends on the fact that there are reasonable interpretations that are made in good faith, that lawyers are arguing, or that jurists have come to the conclusion that it's true, that's not going to be enough, any more than it is true. Scalia It's never more than one correct construction, even when there is, there isn't. I mean, we always have to come up with an answer, and the Patent Office has to come up with an answer. It means this, or it doesn't mean this. Have you ever heard of a court that says, well, you know, it could mean either one of these? No. No.   No.  No. No. No. No. No. No. No. No. No. No. No. No. No. No. No. No. No. No. No. The point is that one of the constructions is going to be better. All they've suggested here is that both constructions, somebody in good faith may win. Scalia So then you win all the time. There's no such thing as ambiguity, because there is always a right answer. As this Court has said in the rule of lenity context, there can be situations where a statute isn't clear. A judge at the end of a plaintiff's case. Alito It sounds like you really are advocating the insolubly ambiguous standard. That's what you're saying. Unless you have to throw up your hands at the end and you say, we can't figure out which one this means, there is no correct interpretation. Unless that's the case, then the patent is valid. The premise of Markman is that in most, if not all, cases, or many, many, many cases where there's going to be real substantial disagreement between two parties, good faith disagreement, where each side is supported by its own reading of the materials, nevertheless, the Court can come to an answer and should come to an answer. I just want to mention quickly, this Court has had several cases where words appeared to be ambiguous on their face, and yet the Court didn't have the trouble applying them and interpreting them in a patent context. Markman was a case about the word inventory. Inventory on its surface could mean either accounts receivable or the actual stuff. In the Yeomans case, the word was manufacturer. Does manufacturer mean the result, or does it mean the process? Alito Well, was the Federal Circuit wrong when it said the test should be insolubly ambiguous? Was that wrong or not? If insolubly means applying the standard tools of claim construction, then it's correct to say that that is what's required. But that term, I think by some district courts, I'll acknowledge, may be misinterpreted to mean as long as we can come up with anything. And it makes it sound as if it's not necessary to actually tie it back to the language of the patent. If the Court is doing it the correct way that Markman prescribes, looking at all the come to an answer, then we would agree, that answer, that the patent is definite. Do you agree with your adversary that the prosecution history is that at the time the patent was issued and not on reexamination or anything else subsequent? I think in this case, it comes out the same. No, no, no, I didn't ask that question. No, I think that the prosecution history later also can count. Explain that, because he says, and it seems logical. That you're going to stifle inventiveness if people can't, once the patent is issued, know how to get around it. Well, let me clarify what I mean by that. If evidence is introduced at a later stage during, say, in reexamination, some of that evidence may be, it may be, the Court may be able to consider that at a later time as being relevant. Let me finish the question. You mean the answer? Yes, the answer. If the Court, in other words, if evidence as here was introduced at reexamination about what skilled artisans knew at the time, the mere fact that it was introduced at a later stage is not a problem. Thank you, counsel. Thank you. Mr. Gannon. Mr. Chief Justice, and may it please the Court. If I'll start with a question that Chief Justice asked, you've already recited the standard that the, that we support here, which is that a patent claim is sufficiently definite under paragraph 2 if a person of ordinary skill in the art would reasonably understand the scope of the claim. And I understand Petitioner's submission to be a dispute about what happens if there are two potentially reasonable constructions at the end of the Markman claim process. And we think that if there are two constructions that are of nearly equal persuasiveness, then that would be ambiguous. But if one construction is appreciably better, that that is good enough without having to take the second step of saying that the second best construction that's not as good and appreciably not as good is, is also unreasonable. We think that that's not the way this Court judges the case. It worries me about that, which is certainly attractive, what you just say, is that lawyers will come up with all kinds of experts, you know. And quite often, if this situation ever arises, and I don't know if it ever really does, it could reflect a difference of opinion among scientists. I mean, you could have those who follow the phlogiston theory of fire, and you could have those who follow the oxygen theory of fire, and all we have to do is update that. And you could find different experts who would have different opinions while all agreeing that it is absolutely clear. I doubt that the Patent Office will very often find that problem arising. And if it does, why not just say, forget about it? As long as you can say reasonable experts can clearly, you know, what you just said. That's the end of it, and we'll tell you what to do later when we really find the problem, or you tell us what to do. I mean, I'm having a problem about it, and I'm explaining what my problem was. Well, I think that the question is, what does it mean when the Court has demanded reasonable clarity or reasonable certainty? And that's the standard that we read in this Court. It's on definite. Can't we just stop there? I mean, do we really have to go into this theoretical dispute between the two scientists who have opposite theories of what a person of ordinary skill in the art would think? I think the person of ordinary skill in the art is a hypothetical legal construct like the reasonable person from tort law. And so I think that the question is, when do we ever decide a case in which we would not say that our result is appreciably better than the result we reject? Well, I think that there are times when the Court would recognize that it's an authentically closer question. And it's still close, but not appreciably better? If it's not appreciably better, we'd have to say it's a draw. I don't think that the Court has a unified field theory of a question. Well, I think the test you're giving us is not much of a test. It really isn't. It seems to me it says, so long as there's a right answer, everything else is wrong. No, I think it says that as long as the right answer is appreciably better than the second-best answer, that you do not have to take the second step of having to declare a second-best answer. How big is appreciable? I don't know. I think it's difficult to put a mathematical precise, a mathematically precise number on it. That's the whole problem with what you're saying. I have no idea what appreciable means. If you – let's say we have a 1 to 0 to 1. I'd say it would be something more like 60-40 than 52-48. And I think that in general, the Court recognizes the difficulty of that type of mathematical precision in applying tests like what it means to be clear and convincing. Usually when we ask whether something is reasonable, we have in mind this reasonable person and a set of circumstances in which the reasonable person is going to act. So in torts, the reasonable person is going to engage in an activity that has some benefits but also has some risks. What would that person do in that situation? Now, here you're saying what would the reasonable, skilled artisan do in what situation? What is this person doing? Setting out to build the device? What – what – They're trying to understand the scope of the claim. And so – and I do think it's important here to recognize that there are two different questions that are getting conflated in some of the discussion. I think that the – with respect to definiteness under paragraph 2, as the court of appeals majority recognized, that this is – in this case, the question is whether the claim clearly states that it requires the electrodes to be arranged in such a fashion that they will have the effect of detecting substantially equal EMG signals at the electrodes. It's not with downstream circuitry, which is what Petitioner suggested in the opening brief. In Petitioner's reply brief, they've suggested that they could use some sort of protective sleeve on the electrodes, but that wouldn't be consistent with the parts of the limitations that say that there needs to be physical and electrical contact with the electrodes. And the majority recognized that there are multiple variables that come into play here, the spacing, the materials, the separation. As my co-counsel was just explaining, and – but the disagreement between the majority and the concurring opinion here is just in whether the functional limitation adheres in the phrase, ''spaced relationship taken in isolation,'' or whether it can be read from the rest of the claim as a whole. Roberts, when you say something like appreciably better, that's a term that may acquire meaning over time, and people get just like reasonableness, you get a good sense of what it means. Is it your sense that the Federal Circuit has been applying its test in this case – I mean, not in this case, but in the series of cases that is – it is close to appreciably better, or is it something quite different? Well, we do acknowledge that the phrases that the Federal Circuit has used about insolubly ambiguous and amenable to construction are subject to be overread. And we do not take the other way. We have to be read, not overread. Well, I think that they – that they could cause mischief if applied in isolation. And we haven't taken a position on every case that the court of appeals has applied these standards in. And I don't think that the court of appeals was intending a market departure from this Court's overarching system. Are there cases where there are two reasonable constructions, but both would be patentable? Well, I think – I think this – this – I think that the court of appeals has not made a decision on the patentability of the statute. I think that we're arguing now about when the second-best construction ceases to be a reasonable one, I think. And I think that if the court wants to think of just whether there is a good enough construction such that there is reasonable clarity as required under United Carbon, and in the mineral separation case where the court said that the certainty that's required is not met, I think that's a good analogy, Mr. Gannon, because sometimes we do say something close to it's a tie. We say there are a couple of reasonable constructions or a number of reasonable constructions, we could pick one, we think it might be better, but it's all close enough that we don't think we ought to pick one. So similarly, it's all close enough that the definiteness requirement has not been met. Is that a good analogy? I think that that would probably — we think that the sorts of constructions that would be reasonable under Chevron that the agency could take as a second-best construction probably aren't sufficient to be the definite construction here. And so I don't think it's a close analogy because we don't think that anyone is seeking that type of deference to another decisionmaker as — No, I'm not sure I quite got that. It's just that anything that would flunk Chevron Step 1 and would go on to Chevron Step 2, you would say that that kind of ambiguity, the kind of ambiguity that would get you to Chevron Step 2, is also the kind of ambiguity that would fail to satisfy the definiteness. No, and I'm sorry if I wasn't clear about this before. I was trying to say that in the 60-40 situation that I said would be adequate here, such that the second construction did not prevent there from being sufficient clarity, I think that we would think that an agency would be entitled to choose the 40 percent option. But we don't think that that would be — that that would prevent the 60 percent option from being good enough in the context required here. Sotomayor, it seems to say that if there's two reasonable constructions and one would make the patent valid, I think this goes to Justice Kennedy's question, that they're obligated to pick the one that makes the patent valid. The case — I think — I believe the case that's being talked about there is cited in the Exxon opinion, and that talks about when there are two equally plausible constructions. I think that that probably is the knife edge of insolubly ambiguous. And there, the Federal Circuit suggested that as Justice Scalia was saying before, that because there would be a decision rule that you would pick the construction that would save the patent, that would be okay. Sotomayor, is that right? I don't think that that allows for sufficient clarity. We believe that if there are two constructions So they're wrong in that as well. In that particular statement of the rule, yes. We do think, however, that there is a distinction between the presumption of patent validity does play a role here. It doesn't change the standard, but it does play a role in indicating that, as the PTO has recognized, that courts will do more to save a patent than the PTO does when it's examining one.  Kennedy, what would it be if it's the same test? Well, it's the overarching question is the same of whether a person skilled in the art would reasonably understand the scope of the claim. If that's the same test at both levels. It's not the same test that the PTO applies in examination proceedings because it uses a slightly different threshold of ambiguity. Are you finished with your answer? I could give an explanation of why. Can you do it in a sentence? I could say that it involves the different circumstances there that include the different record, the different burden of proof, the lack of adversarial presentation there, and most critically, the fact that it's easier to amend the claims before the patent has been issued. Thank you, counsel. Four minutes, Mr. Vandenberg. Thank you. I think the essential points here are, first, the emphatic language that Congress chose, and then thinking about ambiguous claims. There is no legitimate need for ambiguous claims. There is a strong economic incentive for patent attorneys to draft ambiguous claims, not to put all their eggs in that basket. They want some clear claims in case some copious comes along, but they want ambiguous claims so their client can treat it as a nose of wax later as happened here. That is well established in the patent bar, that there is this strong economic incentive. But patent attorneys have ample tools to avoid ambiguous claims if this Court tells them that it will no longer be permitted. That is the key here, is that there is a strong economic incentive. The patent attorney and the inventor are in the best position to avoid the ambiguity that Congress prohibits. And therefore, the problem is the Federal Circuit has blessed ambiguity with its test. And in order to stop all the problems that the amici have pointed out that are caused by ambiguous claims, we submit this Court needs to be clear and go back to United States statutory text and be clear that ambiguity is simply not permitted. In terms of how the Federal Circuit ruled here, and we point to the majority's opinion at Petition Appendix 15a, the Court, the majority, definitely applied the insolubly ambiguous test. They said because the term was amenable to construction, indefiniteness here would require a showing that a person of ordinary skill would find spaced relationship to be insolubly ambiguous. And therefore, if the Court rejects that test, we submit at the very least the Court cannot affirm the judgment below on that basis. But more important to us is that the Federal Circuit said something, looking at the Petition Appendix at 20a, which sounds very close to what the government standard  says, that the claim provides parameters sufficient for a skilled artisan to understand the bounds of spaced relationship. That sounds very close to what the government says, and it doesn't say anything about insoluble in that statement. It is true that here in some of the cases, the Court will, the Federal Circuit will use language like that, saying that one could have understood. However, it's clear they were not applying the type of test that United Carbon and General Electric required. They did not even consider whether the person of skill in the art may have read the claim the different way. And in terms of the two different claim scopes, we would simply invite the Court's attention back to our reply brief at page 20, which explained the different claim scopes. We think the government misunderstood the point, and therefore, in the reply, we amplified it some more. But as I said, the Court, at the very least, should not affirm, but we think it's important here for the Court to create another concrete guidepost. In KSR and Bilski, this Court provided a huge service to the patent bar in applying the correct law to an actual patent claim, creating concrete guideposts for section 101 and 103. Well, the patent bar and the trial courts need another concrete guidepost of applying the correct law of section 112, paragraph 2 to this particular claim. If there are no further questions, thank you. Roberts. Thank you, counsel. The case is submitted.